UNITED STATES DISTRICT COURT

District of Maine

U.S. DISTRICT COURT
DISTRICT OF MAINE
RECEIVED & FILED
2020 DEC -2 P 4: 46
DEPUTY CLERK

| | | |
|---|---|---|
| ZACHARY SWAIN, ROBERT CARROLL, RYAN LANE, JACOB ZERNICKE, NICHOLAS GLADU, ANTHONY HARDY, and others similarly situated, | : : : : | Docket No: 1:20-CV-00449-JDL |
| **Plaintiffs** | : | **VERIFIED CLASS ACTION COMPLAINT FOR** |
| | : | **DECLARATORY AND INJUNCTIVE RELIEF AND** |
| **v.** | : | **DAMAGES** |
| | : | **(Jury Trial Demanded)** |
| MAINE DEPARTMENT OF CORRECTIONS, RANDALL LIBERTY, | : | |
| RYAN THORNELL, MATTHEW MAGNUSSON, TROY ROSS, | : | |
| ANTHONY CANTILLO, HEATHER RICHARDSON, and JOHN DOES | : | |
| 1-12; and WELLPATH, LLC., AMANDA SEIRUP, JASCHA | : | |
| PROPP, DANIEL RITTER, sued individually and in their | : | |
| official capacities, | : | |
| **Defendants** | X | |

**1.** This is a civil action for declaratory and injunctive relief and damages, to redress the continuing deprivation of rights secured by the First, Eighth and Fourteenth Amendments to the United States Constitution, Title 42 U.S.C. §1983, and the Americans with Disabilities Act and Rehabilitation Act of 1973. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343 (a)(4), 1367 (a), and 2201.

**2. Plaintiff ZACHARY SWAIN** is a named representative of the proposed class action. Swain is 24 years old and suffers serious mental health disorders, developmental disorder, and neuro-psychiatric disorder: (a) autism spectrum disorder; (b) sensory integration dysfunction; (c) PTSD; (d) major depression with sucidal ideation; (e) severe anxiety with panic attacks; and (f) brain injury from near-successful suicide by hanging attempt in or about September 2020.

**3. Plaintiff ROBERT CARROLL** is a named representative of the proposed class action. Carroll is 29 years old and suffers serious mental health disorders and neuropsychiatric disorder: (a) tuberous sclerosis complex (which is a neurodegenerative disease that attacks the central and peripheral nervous system, in addition to the kidneys, pancreas, skin, and bone; which causes progressive psycho motor retardation and devastating mental deterioration); (b) manic depression with sucidal ideation; (c) ADHD; and (d) anxiety disorder.

**4. Plaintiff RYAN LANE** is a named representative of the proposed class action. Lane is 27 years old and suffers serious mental health disorders and neuropsychiatric issues: (a) PTSD; borderline schizophrenia; (c) major depression with psychotic features; (d) severe anxiety disorder; and (e) hepatitis C virus that causes intermittent liver failure and dysfunction which consequently cause hepatic encephalopathy and delirium.

5. Plaintiff JACOB ZERNICKE is a named representative of the proposed class action. Zernicke is 22 years old and incarcerated at Maine State Prison in Warren, Maine. He suffers the following serious mental health and neuropsychiatric disorders: (a) major depression with psychotic features; (b) severe anxiety; (c) schizoaffective disorder; (d) and brain injury with overt signs of cognitive deficits.

6. Plaintiff NICHOLAS GLADU is a named representative of the proposed class action. Gladu is 36 years old and incarcerated at Maine State Prison in Warren, Maine. He suffers the following serious mental health, developmental, and neuropsychiatric disorders: (a) autism spectrum disorder; (b) sensory integration dysfunction; (c) major depression; (d) severe anxiety; (e) PTSD; (f) and medical conditions known to cause delirium, and (g) history of traumatic brain injuries.

7. Plaintiff ANTHONY HARDY is a named representative of the proposed class action. Hardy is 29 years old and incarcerated at Maine State Prison in Warren, Maine. He suffers the following serious mental health disorders: (a) major depression; (b) anxiety with panic attacks; (c) substance abuse disorder; (d) PTSD; (e) ADHD, and (f) psychosis.

8. Defendant MAINE DEPARTMENT OF CORRECTIONS is, and at all times relevant was, a governmental entity organized under the laws of Maine. It is sued in its official capacity.

9. Defendant RANDALL LIBERTY is the Commissioner of Corrections for MDOC. He was appointed by the Governor, and is the chief administrative officer of the Maine Department of Corrections (hereinafter "MDOC") which maintains and administers, and has under its control all Maine correctional institutions and their prisoners. He is sued individually and in his official capacity.

10. Defendant RYAN THORNELL is Deputy Commissioner of MDOC. He was responsible for promulgating and maintaining statewide departmental regulations regarding the rights and privileges of prisoners at penal facilities under the authority of the department.

11. Defendant MATTHEW MAGNUSSON is the warden of Maine State Prison and is responsible for the administration of the prison and the custody of prisoners incarcerated therein. He is sued individually and in his official capacity.

12. Defendants **TROY ROSS** and **ANTHONY CANTILLO** are deputy wardens of security and programs and services, respectively, at MSP. They are responsible for assisting in implementing all applicable laws and regulations at MSP. They are sued individually and in their official capacities.

13. Defendant **HEATHER RICHARDSON** is the unit manager for SMU at Maine State Prison. She is responsible for supervision of correctional staff within SMU and implentation of all applicable laws and regulations within SMU. She is sued individually and in her official capacity.

14. Defendants **JOHN DOES 1-12** are sued under fictitious names, their true names and capacities being unknown to Plaintiffs. Plaintiffs are informed and believe that John Does 1-6 are responsible for some manner of the occurrances in COUNT I and II and John Does 7-12 are responsible in some manner for the occurances in COUNT IV. They are sued individually and in their official capacities.

15. Defendant **WELLPATH, LLC** is a private corporation contracted with the state of Maine to provide medical and mental health care and treatment to the prisoners confined within MDOC, including the Plaintiffs. It is sued individually and in its official capacity

16. Defendant **AMANDA SEIRUP** is a psychologist and clinical supervisor for Wellpath, LLC. She is responsible for supervision of mental health clinicians at MSP and for ensuring prisoners within MDOC are provided adequate mental health care and for implementing all applicable laws and regulations. She is sued individually and in her official capacity.

17. Defendant **JASCHA PROPP** is a psychologist and Director of Behavioral Health Services at MSP for Wellpath, LLC. He is responsible for ensuring all applicable laws and regulations are implemented at MSP and providing MSP prisoners adequate mental health care and treatment.

18. Defendant **DANIEL RITTER** is Health Services Administrator for Wellpath, LLC at **MSP.** He is responsible for ensuring adequate staffing of mental health providers at MSP and for generally ensuring prisoners are provided timely access to health care and adequate mental health attention and treatment.

19. Defendants each and all acted under color of state law at all times relevant.

20. Defendants Wellpath, Seirup, Propp, and Ritter's address is: Wellpath, LLC, **151 Capitol St. Suite 4,** Augusta, ME 04330

21. Plaintiffs bring this action on their own behalf and on behalf of all other prisoners similarly situated (those whom suffer serious mental illness and being subject to long-term segregation while incarcerated at MSP).

22. Each of the Plaintiffs and those similarly situated constitute a class in accordance with the provisions of Rule 23 (a) and (b) of the Federal Rules of Civil Procedure. The persons who constitute the class are so numerous that joinder of all members is impractical. There are questions of law and/or fact in common to the class; the claims of the Plaintiffs are typical of the claims of each class; the Plaintiffs will fairly and adequately protect the interests of each member of the class; prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications and would establish incompatible standards for the Defendants, their agents and subordinates; and Defendants have acted and refused to act on grounds that are generally applicable to all members of the class, making declaratory and injunctive relief with respect to the class as a whole appropriate.

23. Plaintiffs assert that the totality of conditions alleged below, further violate the Eighth Amendment to the United States Constitution.

## COUNT I
(as to Defendants MDOC, Liberty, Thornell, Magnusson, Ross, Cantillo, and Richardson)

24. Plaintiffs suffer serious mental illness, yet Defendants continue to subject them, and other mentally ill prisoners, to abject confinement marked by conditions so lacking in physical and social points of reference that psychological torture and acts of self-harm are inevitable and certain.

25. The above described diagnoses suffered by Plaintiffs, have been and are known by the Defendants who, despite this knowledge, have intentionally and wilfully continued

to subject Plaintiffs to abject solitary confinement without necessity or meaningful due process, with deliberate disregard to the dangers and suffering imposed, and in violation of their own policies which prohibit continuous segregation of mentally ill prisoners.

(i) Swain has been in continuous segregation since on or about May 17, 2020

(ii) Carroll has been in continuous segregation since April 23, 2020

(iii) Lane has been in continuous segregation since September 20, 2020

(iv) Zernicke has been in continuous segregation since on or about July 07, 2020

(v) Gladu has been in continuous segregation since April 22, 2020

(vi) Hardy has been in continuous segregation since on or about May 23, 2020

26.1 Defendants lack necessity or justification for abject segregation of Plaintiffs.

(i) Carroll has been allowed out of his cell at various times unrestrained while around other restrained prisoners and staff. Which occurred in or about June and July 2020. Also, after returning from a hospital trip in or about September 25, 2020, Carroll was unrestrained from the SMU garage to his cell in B-wing. Which instances collectively evince a lack of necessity for abject solitary confinement.

(ii) Gladu has also been allowed out of his cell at various points over the last several months to assist with unit cleaning and other tasks while unrestrained. Which instances occurred in or about August, September, and October 2020, and evince that Gladu presents no immediate threat to the safety of others.

(iii) Zernicke has been allowed out of his cell at various times over the past several months to assist with unit tasks while unrestrained. Which instances evince that he also is not an immediate threat to others.

26.2 Plaintiffs have and continue to suffer severe exacerbation of existing serious mental illness due to abject solitary confinement.

(i) Plaintiffs individually suffer severe depression, anxiety, and mental decompensation as a result of their continuous segregation placements.

(ii) Plaintiffs each suffer acute confusional states and persecutory ideation, at times reaching delusional proportions.

(iii) Plaintiffs each experience massive free-floating anxiety, hyper-responsiveness to external stimuli, perceptual distortions and hallucinations in multiple spheres (auditory visual, and olfactory), derealization experiences, difficulty with concentration and memory, and motor excitement associated with sudden self-mutilatory outbursts

, (iv) Swain has made several suicide attempts during continuous segregation. Most recently and notably, in or about September 2020, he nearly succeeded in suicide by hanging. Swain was discovered by prison staff unresponsive hanging from a bed sheet in his cell. It reportedly took medical personnel several minutes to revive Swain. He was then rushed to the hospital by ambulance where he received emergency care and treatment. An ER physician told Swain that he would likely suffer consequent brain injury as a result of lack of oxygen and blood to his brain while hanging.

(v) Swain also has well over 30 serious incidents involving significant self-harm while in segregation. Which have each almost always resulted in emergency hospitalization and surgical procedures. Those mental health crises include swallowing large pieces of sharp metal, ingesting toxins, and cutting himself. Swain has permanent severe GI damage now as a result.

(vi) Carroll has cut-up and recently hospitalized for ingesting large pieces of sharp metal.

(vii) Hardy has been hospitalized several times within the last few months for self-mutilation

(viii) Zernicke has been hospitalized in September 2020 and November 2020 for self-mutilation

23. Plaintiffs' mental decompensation and exacerbated serious mental illness suffered due to abject segregation has and continues to cause additional disciplinary and rule violations (e.g. verbal outbursts, acts of self-harm, etc.) which result in Plaintiffs segregation placements lasting into perpetuity.

25. Plaintiffs are each accused of allegedly assaulting a correctional staff member and presently subject to continuous segregation placement as result of those allegations; despite numerous months elapsing since those alleged incidents and without being afforded consideration for underlying serious mental illness and/or neuropsychiatric disorders as potential causation for such conduct even though exculpable facts or evidence exist to reasonably challenge or question criminal responsibility and ability to appreciate wrongfulness of conduct.

29. Upon information and belief, Defendants are subjecting Plaintiffs to abject segregation as means to inflict severe psychological suffering and distress as punishment and in retaliation for these alleged staff assaults, with wanton and malicious disregard of Plaintiffs existing and documented serious mental illness and/or neuropsychiatric disorders.

30. On or about April 24, 2020, at approximately 3:50 pm, Defendant Richardson walked past Carroll's cell in SMU A-2 (cell 208), saying that she was "leaving for the day." Carroll said "Have a good day, ma'am." Defendant Richardson stopped turned to Carroll and stated: "What you did was very wrong." (referencing an alleged staff assault, days earlier) "While I'm working down here, I will make sure you get nothing, you've burnt your last bridge you piece of shit!"

31. The above conversation took place in the presence of several other prisoners, whom personally witnessed Defendant Richardson make such statements.

32. Defendant Richardson has and continues to voice her disdain for conduct involving staff assaults. She has repeatedly made comments that she believes prisoners accused of staff assaults should be "buried in seg." She has also stated: "You guys should only be assaulting eachother, not staff."

33. MDOC policy 15.2 "Disciplinary Segregation Status" Proc. C(10) expressly prohibits Defendants from subjecting prisoners with serious mental illness to segregation status for longer than 7 days.

34. MDOC policy 15.2 Proc. C(14) further limits Defendants from subjecting any other prisoner to segregation status for any more than 30 days, expressly requiring objective basis or rationale of prisoner being an immediate threat to the safety of others to justify continued segregation.

35. Defendants knowingly violate said departmental policies on a daily basis, especially with respect to Plaintiffs continuous segregation for 6 months or more and still counting.

36. Defendants have various other restrictive placement options to house Plaintiffs in lieu of abject segregation, but have and continue to wilfully disregard those options.

37. Swain, Carroll, and Gladu have each requested placement in the "Intensive Mental Health Unit" in lieu of abject segregation, due to aforesaid mental decompensation and exacerbated existing serious mental illness. Defendants denied each such request and summarily dismissed Plaintiffs' continued concerns over deteriorating and worsening mental health.

38. Plaintiffs have each individually and collectively requested Defendants to remove them from continuous segregation.

(i) On or about August 27, 2020, Swain made oral request to Magnusson, Ross, Cantillo, and Richardson to be removed from segregation status and housed in the Intensive Mental Health Unit, due to substantially worsening and exacerbated mental health decompensation owing to continuous segregation. Defendants Magnusson, Ross, Cantillo, and Richardson denied Swain's request.

(ii) Swain, and Swain's mother, made subsequent requests to Defendant Magnusson for him to be removed from continuous segregation for the same reasons stated above. Again, Defendant Magnusson denied such requests.

(iii) On or about July 07, 2020, Carroll submitted written requests to Defendants Thornell, Magnusson, and Cantillo. To date, Defendants have failed or refused to respond to Carroll's requests for removal from segregation due to worsening and exacerbated mental health decompensation.

(iv) In or about September 2020, Carroll submitted written request to Defendant Magnusson for placement in IMHU in lieu of segregation due to his serious neurodegenerative disease and neuropsychiatric manifestations. To date, Defendant Magnusson has failed or refused to provide response to Carroll's request.

(v) On or about July 23, 2020, Gladu submitted written request to Defendant Richardson to be removed from segregation status due to significantly worsening and exacerbated mental health. Defendant Richardson denied Gladu's request and suggested he reach out to mental health staff to deal with mental health issues.

(vi) On or about October 27, 2020, Gladu submitted another request to Defendants for removal from segregation status and placement in IMHU. To date, Defendants have not responded to Gladu's request.

39. Defendants MDOC, Liberty, Thornell, Magnusson, Ross, Cantillo, and Richardson each approved of, authorized, had knowledge of, ratified and consented to continuous segregation of Plaintiffs despite knowledge that they suffered serious mental illness and decompensation while segregated.

40. While housed in segregation (SMU A-2), Plaintiffs are subject to the following conditions:

(i) 23 or more hours of cell confinement per day.

(ii) 1 hour per day of out-of-cell recreation/exercise in an outdoor small chain linked cage (approx. 10' x 15'), only during non-inclement weather.

(iii) Only one 10 minute phone call per week (which conflicts with MDOC policy which implies one 30 minute phone call shall be provided per week)

(iv) Almost no opportunities to make legal phone calls (despite MDOC policy allowing such phone calls)

(v) Only 2-3 showers per week (despite MDOC policy allowing at least 3 showers per week).

(vi) No opportunities for indoor out-of-cell exercise (despite MDOC policy allowing such)

(vii) No TV, radio, CD player, or other personal property

(viii) Meals consistently served significantly under temperature guidelines for safety and prevention of food-borne illness. (which is contrary to MDOC policy)

(ix) Meals served without eating utensils or drink cups. Plaintiffs and other segregation prisoners are forced to re-use plastic silverware for several months at a time. (which conflicts with MDOC policy requiring clean/new eating utensils be served with each meal).

(x) No access to gainful programming or educational services, out-of-cell group programming, or other rehabilitative services.

(xi) Grossly inadequate hygiene access. Hygiene is supposed to be distributed twice per week (eg: soap, toothpaste, toothbrush, deodorant, etc.), but in practice is often only distributed twice per month. Which results in constant deprivations of basic necessities to maintain proper hygiene. Also, almost no access to shaves or haircuts.

(xii) Grossly inadequate sanitation. SMU A-2 is scheduled to be cleaned daily (eg: day room area, showers, stairs, etc), but is actually only cleaned once per 1-2 months.

which results in constant unsanitary environment and unnecessary exposure to pathogens and other health concerns. Which practice also continued throughout the COVID-19 pandemic and facility infections.

(xiii) Grossly inadequate access to medical and mental health care and treatment. Very low priority is given to SMU A-2 prisoners for medical or mental health care. Plaintiffs often wait several months for such services. Glado is seen by mental health clinician once every 3-6 weeks for a 10-15 minute session; while Carroll, Lane, Hardy, and Zernicke are seldomly seen by mental health clinician for any session at all.

(xiv) No segregation staff with formal training or experience with traumatic brain injury, serious mental illness, or neuropsychiatric disorders/ developmental disorders (eg. autism) Which results in near daily conflict between prison staff and segregation prisoners wi those diagnoses or disorders, many times leading to unnecessary incidents involving self-harm or use-of-force.

(xv). Access to unit library cart with permanent selection of approximately 50-75 books, and irregular access to additional reading materials through the facility librarian that is supposed to occur weekly but only actually occurs 1-2 times per month.

41. Human beings cannot remain in such circumstances without being harmed. Plaintiffs have already begun to experience severe mental anguish, anxiety, and grave depression, in addition to symptoms of various physical and mental ailments, as a result of the continuous and unnecessary solitary confinement described above.

42. The above intolerable and inhumane conditions, have been and are known by the Defendants who, despite this knowledge, have intentionally and wilfully failed, and continue to fail, to alleviate such conditions, in violation of the Eighth and Fourteenth Amendment of the U.S. Constitution, and Americans with Disabilities Act and RA.

43. The Defendants' use of abject solitary confinement on prisoners with serious mental illness and without necessity, demonstrates the need for judicial scrutiny of such low visibility decisions, which are dangerous to inmate health, which constitutes cruel and unusual punishment, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Americans with Disabilities Act and RA.

44. Defendants' use of abject solitary confinement marked by onerous and other unconstitutional conditions to intentionally inflict suffering and distress upon prisoners with serious mental illness, is violative of Plaintiffs rights under the Eighth and Fourteenth Amendments to the United States Constitution and Americans with Disabilities Act and RA.

45. The absence of a meaninful review process for continuous segregation of prisoners with serious mental illness, is violative of Plaintiffs rights under the Fourteenth Amendment to the U.S. Constitution and ADA and RA.

46. Defendants' failure or refusal to place Swain, Carroll, Gladu, and/or Zernicke in a mental health UNIT in lieu of abject solitary confinement without necessity, despite overt mental health decompensation and/or serious mental illness, demonstrates deliberate indifference to serious mental health needs, which constitutes cruel and unusual punishment, in violation of the Eighth Amendment of the US Constitution and ADA and RA.

## COUNT II

47. Plaintiffs repeat and incorporate paragraphs 2 through 46 above as if fully set forth herein.

48. From April 22, 2020 through present date, Plaintiffs were subject to the following conditions:

(i) On or about May 05, 2020, Gladu was informed by prison staff that the SMU A-2 supply of toothpaste and soap was depleted. Which continued up to on or about May 28, 2020. Swain, Carroll, Gladu, and Hardy were each affected by this deprivation of necessary hygiene items. Which also occurred in the midst of a global pandemic of CoViD-19, causing Plaintiffs named above to suffer unnecessary exposure risk to pathogens and/or other potential health risks.

(ii) On or about Juiy 11, 2020, Gladu and Carroll were again informed by SMU A-2 staff that additional hygiene supplies (eg; toothbrush, soap, etc) were depleted. Which deprivation lasted another 2-3 weeks and affected Gladu, Carroll, Swain, Hardy, and Zernicke.

(iii) On or about July 26, 2020; August 02, 2020; August 09, 2020; August 23, 2020; August 30, 2020; September 06, 2020; September 13, 2020; September 20, 2020; September 27, 2020; October 04, 2020; October 11, 2020; October 18, 2020; October 25, 2020, and November 01 and 08, 2020 Defendants Richardson and John Does 1-12 failed to distribute necessary hygiene (eg; soap, toothpaste, toothbrushes, deodorant, etc) and/or provide razors for shaving as scheduled.

(iv) Commencing on or about August 17, 2020 and continuing through November 11, 2020, Defendants Richardson and John Does 1-12 failed to facilitate or otherwise ensure that SMU A-2 dayroom, showers, and other common areas were cleaned each day as scheduled. In fact, during said duration, SMU A-2 was only cleaned on approximately 5-6 of the days in question. As a result, Plaintiffs are/were needlessly exposed to various potential health risks (eg; pathogens, organisms, etc) during an active health pandemic. Gladu is unable to use the SMU A-2 showers because of this ongoing issue, as he has suffered several opportunistic fungal infections from use of the uncleaned communal showers. Lane also recently suffered opportunistic fungal infection following use of SMU A-2 showers.

(v) The "Hygiene and Sanitation schedule" posted in SMU A-2 states the unit is to be cleaned every day of the week, including but not limited to; dayroom, showers, common areas, etc. . From April 22, 2020 through November 11, 2020, Gladu has only been able to exchange his bedding (eg; sheets, blankets, pillowcase, etc) on two occassions, due to Defendants Richardson and John Does 1-12 failing to provide Gladu and other prisoners in SMU A-2 with clean sheets each week and clean blankets every other week as scheduled.

(vi) From August 17, 2020 through present date, Defendants Richardson and John Does 1-12 have and continue to fail to provide Plaintiffs, and other SMU A-2 prisoners, with eating utensils or drink cup with any meal. As a result, Plaintiffs have had to re-use "single use" plastic spoons and paper drink cups for several months. Which is extremely unsanitary and causes additional unnecessary exposure to health risks.

(vii) Gladu has been re-using the same plastic spoon since August 17, 2020, Carrol has been re-using the same plastic spoon since August 17, 2020. Lane has been re-using the same plastic spoon for approximately 45 days Hardy has been re-using the same plastic spoon for approximately 60 days, Zernicke has been re-using the same plastic spoon for approximately 60 days.

(viii) Since July 11, 2020 through present date, nearly every meal served in SMU A-2 has been significantly below or above the recommended serving temperatures; due to:

   (a) SMU A-1 and A-2 "meal cart" consisting of a simple office supply cart without enclosed/insulated space to protect food or maintain temperature.

   (b) SMU A-1 and A-2 meals being consistently served in paper trays, rather than usual plastic trays with sealable lids.

   (c) SMU A-1 and A-2 meals being left for in excess of 45-60 minutes waiting in hallway prior to being served in either unit.

Which acts and omissions are/were caused by Defendants Richardson and certain John Does 1-12. As a result, Plaintiffs routinely suffer symptoms of food-borne illness (eg. stomach pain, diarrhea, fatigue, and other GI issues).

(ix) For the last several years, Defendants Liberty, Thornell, Magnusson, and certain John Does 1-12 are/were aware that the SMU A-1 and A-2 heating and cooling system is in need of repair as it is constantly malfunctioning and shutting down. Which results in no heat whatsoever during winter months with frigid temperatures. From April 22, 2020 to present date, these heating and cooling system issues have continued in SMU A-2. On or about October 20, 2020 and October 26, 2020, prison staff performed thermal readings within SMU A-2 cells and noted temps of 61°- 65°. Which is well-below minimum temperature guidelines for that time of year. On or about November 01, 2020 maintence staff informed Plaintiffs that the SMU A-1/A-2 heating and cooling system was somehow still running on air conditioning. Plaintiffs are greatly concerned of what their cell temps will be once frigid winter months arrive.

(x) Since April 22, 2020 and continuing through present date, Defendants have outright failed to provide Plaintiffs, and other SMU A-2 prisoners, with any out-of-cell and/or group programming to better themselves.

(xi) Since April 22, 2020 and continuing through present date, Defendants have imposed overly restrictive and harsh conditions on telephone access for Plaintiffs, and other SMU prisoners. Defendants only allow one 10 minute phone call per week, when MDOC policy implies that a full (30 minute) phone call be afforded each week. Moreover, Defendants even count the time it takes for the telephone system to process and connect the call (usually 3-4 minutes) toward the prisoners 10 minutes. Which ultimately results in 5-6 minute phone calls at times. Also, should a prisoner be unable to connect or complete a call, Defendants count the "attempt" as the prisoners phone call for that week. Which is extremely harsh considering access to the telephone is almost always provided at random times on phone call day (Sunday, Tuesday, and Friday): On or about October 03, 2020, for instance, SMU staff started phone calls at 6:45 am. So, if a prisoner wanted to use the phone that day, and hadn't already used his one call that week, then he could attempt to call his family or friends on a weekend morning at 6:45 am. Which translates to an almost guaranteed failed attempt, but counts as a phone call for that week anyway.

(xii) Since April 22, 2020 and continuing through present date, Plaintiffs have not been permitted to possess or earn personal property (eg. TV, radio, CD player, etc.) while in abject confinement to reduce psychological adverse affects and/or exacerbated mental health issues. Defendants intentionally create overly restrictive and harsh conditions in SMU A-2, to maximize mental anguish and emotional distress suffered by Plaintiffs, and other mentally ill prisoners.

49. Human beings cannot remain in such circumstances without being harmed. Plaintiffs have already begun to suffer severe psychological anguish and distress, major depression with suicidal ideation and/or psychosis, in addition to those existing mental health disorders as a result of the onerous totality of conditions described above, which constitutes cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States.

50. The aforesaid conditions have been and are known by the Defendants who, despite this knowledge, have intentionally failed, and continue to fail, to alleviate such conditions, in an effort to intensify and aggravate an already existing psychologically distressful and painful atmosphere, which constitutes cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States.

## COUNT III

51. Plaintiffs have and continue to be denied adequate mental health care and treatment while in abject solitary confinement.

52. Defendant Wellpath, LLC has a custom and policy of intentionally under-staffing mental health providers at Maine State Prison which causes consequent impossibility of meeting the mental health needs of the prisoner population.

53. Defendant Wellpath, LLC has a custom and policy of giving low priority to mental health needs of prisoners in segregation.

54. Upon information and belief, Defendant Wellpath, LLC intentionally understaffs mental health providers at Maine State Prison to cut costs and operating expenses while increasing profits.

55. Defendants Wellpath, LLC, Seirup, Ritter, and Propp are individually and collectively responsible for ensuring adequate staffing levels of mental health clinicians,

56 Defendants Wellpath, LLC, Seirup, Ritter, and Propp are individually and collectively responsible for providing adequate mental health care and treatment to Plaintiffs, but have and

continue to fail to do so.

(i) Swain's diagnoses of autism spectrum disorder and sensory integration dysfunction require occupational therapy, sensory accommodations (eg; reducing exposure to tactile inputs), and other interventions and treatments in order for Swain to maintain a functional level of alertness and emotion regulation. All of which Defendants Wellpath, Seirup, and Propp have and continue to fail or refuse to provide. As a result, Swain has been largely unable to maintain functional level of alertness and emotion regulation. Swain suffers daily sensory processing overloads due to not being offered or provided adequate treatment or interventions for these diagnoses, which are often very severe and debilitating; and substantially interfere with Swain's ability to participate or benefit from prison services, programs, or activities. Swain often forgos recreational periods due to debilitating sensory processing issues and consequent inability to maintain a functional level of alertness and emotion regulation. He also has a very difficult time concentrating or reading.

(ii) Swain's remaining diagnoses of severe depression, anxiety, PTSD, etc. require cognitive behavioral therapy, medication, and other interventions (eg; relaxation aides, etc.) Most of which, Defendants Wellpath, Seirup, and Propp have and continue to fail or refuse to provide. CBT is often only provided to Swain on an irregular basis (eg; once every several weeks) for 20-30 minute session or less, despite ongoing mental health crises and/or decompensation owing to abject solitary confinement. Which denial of adequate care and treatment has resulted in a near-successful suicide attempt and dozens of instances of very serious self-harm. Swain's anxiety and depression often reach debilitating levels and substantially interfere with his ability to participate or benefit from prison services, programs, or activities (eg; recreation period outside for one-hour, law library, etc). Swain's anxiety, depression, and PTSD impede his ability to concentrate, read, write, perform work, and other tasks.

(iii) Carroll, Lane, Zernicke, Hardy, and Gladu's diagnoses of major depression, severe anxiety, PTSD, ADHD, etc all require cognitive behavioral therapy, medication, and other interventions for treatment. Carroll, Lane, Zernicke, and Hardy have and continue to be denied any CBT whatsoever. Gladu has and continues to be provided CBT every 3-6 weeks (or longer) for mere 10-15 minute sessions with a mental health clinician. Moreover, medication based appointments are only provided once every 90 days. As a result, Carroll, Lane, Zernicke, Hardy, and Gladu are often unable to obtain necessary medications or make changes to existing medication orders. Which prolongs needless suffering of serious mental health issues and disorders. As a result, these named Plaintiffs mental health issues substantially interfere with their ability to participate or benefit from various prison programs, services, or activities due to mental health decompensation or debilitating symptoms (eg; severe anxiety, major depression, PTSD, etc).

(iv) Gladu's diagnoses of autism spectrum disorder, sensory integration dysfunction, and somatic symptom disorder require occupational therapy, sensory accommodations (to reduce exposure to tactile inputs), and other interventions as treatment. None of which Defendants Wellpath, Seirup, or Propp have provided to Gladu. Defendant Seirup recently told Gladu that OT is not available to prisoners at MSP. As a result, Gladu suffers debilitating sensory processing overloads and is consequently unable to maintain a functional level of alertness and emotion regulation. Which substantially interferes with his ability to manage from day-to-day and participate in prison services, programs, or activities. Mainstay treatment and interventions for somatic symptom disorder consist of relaxation aides and CBT. Neither of which are adequately provided to Gladu by Defendants.

(v) Defendants Wellpath, Seirup, Ritter, and Propp have and continue to fail to arrange a neuropsychological evaluation ordered for Gladu (by Dr. James Fine, MD of Wellpath, LLC In or about August 2020) owing to Gladu's history of TBI's and other neuropsychiatric issues. Which recommendation has been recommended also by a clinical neuropsychologist from

57. Defendants Wellpath, Seirup, Ritter and Propp knew or reasonably should have known that mental health care and treatment in segregation is/was grossly inadequate due to systemic deficiencies and rampant understaffing.

58. Plaintiffs sick call slips requesting mental health care and treatment for serious needs are/were not responded to in a timely manner.

59. Plaintiffs sick call slips indicative of a serious mental health need are sometimes not responded to at all.

60. On or about June 15, 2020 Gladu submitted sick call slips to mental health staff indicative of serious needs. Mental health staff failed to respond to Gladu's sick call slip for nearly 6 weeks.

61. On or about October 18, 20, and 22, 2020, Gladu submitted sick call slips to mental health staff indicative of serious needs (thoughts of suicide, self-harm, adverse medication effects, severe depression, etc). Mental health staff responded to Gladu's medication concerns on November 16, 2020, but those other issues are still outstanding and have not yet been addressed.

62. MDOC Policy 18.03 "Access to Healthcare" requires Defendants Wellpath, Seirup, and Propp to properly respond to sick call complaints with serious mental health needs within 72 hours of reciept; and immediate response to any sick call indicative of a potential mental health crisis or emergency.

63. Defendants Wellpath, Seirup, Ritter and Propp had been delegated and were performing state functions that were historically, traditionally and exclusively governmental.

64. Defendant Liberty, as commissioner of Maine Dept of Corrections is/was responsible for establishing and implementing policies, practices and procedures designed to ensure that Plaintiffs, and other segregation prisoners, received adequate mental health attention and treatment, but has and continues to fail to do so.

65. In general, Defendants showed deliberate indifference to the mental health needs of segregation prisoners housed in SMU A-1/A-2, and particularly neglected those of the plaintiffs.

66. Mental health care at MSP is/was inadequate and unprofessional. Medical and/or mental health records, vital in assessing a patient's potential for acute severe exacerbation of existing mental illness, were not used to assist screenings or assess decompensation or mental deterioration. Deficiencies are/were the norm, and Plaintiffs were unable to obtain care or treatment upon request. Plaintiffs often had to submit grievances to receive mental health care or engage in self-harm or self-mutilation to receive care from mental health provider or the hospital.

67. Mental health screenings are required to be performed of each segregated prisoner at least once per week. However, rampant understaffing doesn't always permit those screenings to occur and/or only allows mental health staff to perform a very brief (approximately 30 seconds to 1 minute) and equally cursory check-in/screening through cell door and in the presence and within ear shot of other prisoners. Which practice and custom leaves no meaningful opportunity for segregation prisoner to seek or receive mental health attention and care, or for mental health clinicians to adequately perform required weekly screenings.

68. The aforesaid acts and omissions constitute deliberate indifference to Plaintiffs' serious mental health needs, in violation of the Eighth Amendment to the U.S. Constitution.

69. The aforesaid acts and omissions, disparate treatment, and refusal to provide reasonable accommodation for mental disabilities constitute discrimination on the basis of physical or mental disability, in violation of the Americans with Disabilities Act and RA.

70. At all times relevant, Plaintiffs were qualified individuals with disabilities under the law.

COUNT IV

(as to Defendants Liberty, Magnusson, Richardson, and John Does 7-12)

71. The mail processing system at MSP has and continues to be extremely inadequate. Mail is frequently lost or misplaced.

72. Gladu has not received numerous correspondence from the United States District Court of Maine, Maine Superior Court, and various lawyers. Which most recent instances include notice of recommended order by US District Court. Gladu's outgoing legal mail has also failed to be delivered to intended correspondents after being turned over to MSP staff.

73. Gladu is subscribed to various publications which routinely fail to be delivered to him despite publishers verifying those publications had been mailed to him. Most recently, Gladu did not receive his "Down East" magazine for May or October of 2020, "US Weekly" for 1 week in July 2020 and 2 weeks in June 2020, and The Week magazine for weeks of June 26, July 03, July 24, August 28 of 2020.

74. Gladu was also subscribed to USA Today newspaper from May 05, 2020 through August 05, 2020, which subscription Gladu ended due to chronic delivery issues within SMU of Maine State Prison. On average Gladu had received 3 of 5 USA newspapers per week.

75. Gladu will later amend to add dates and additional instances similar to those alleged above.

76. Carroll is subscribed to US Weekly and did not receive weekly editions from September 25 through on or about October 09, 2020. He also did not receive his Smithsonian magazine for the months of September 2020 and October 2020.

77. Swain was subscribed to Portland Press Herald for daily delivery via U.S. mail. Which subscription failed to be delivered by MSP staff while in SMU on numerous occassions from in or about May 2020 through August 2020. Swain did not receive any of his newspapers at all from in or about May 2020 through July 2020. Which missing newspapered were verified as delivered from

Press Herald.

78. Hardy has also not received several pieces of expected mail from his mother and girlfriend in or about June 2020, July 2020, August 2020, and September 2020. Which he estimates to be at least 4 instances.

79. Upon information and belief, MSP mailroom staff deliver SMU prisoner mail to "SMU Local Control," which officer assigned to that post for the day is then delegated the task of sorting SMU prisoner mail by housing unit (eg. SMU A-1, SMU A-2, SMU B, and SMU C). Which mail sorting task is traditionally performed by the mailroom for all other areas and units at MSP.

80. Upon information and belief, the SMU Local Control post is not assigned to any one correctional staff member from either shift. Instead, the post is worked by many different staff throughout each week, with varying levels of knowledge for that post.

80. Upon information and belief, SMU Local Control has and continues to be a "hang out" spot for SMU rovers and other staff. Whom sometimes assist with the sorting of prisoner mail and/or otherwise have unfettered access to prisoner mail for SMU.

81. MSP current practices for incoming SMU prisoner mail afford no protections against or accountability for unlawful acts of confiscation, disposal, or interference with prisoner mail. SMU prisoner mail is not sorted, stored, or distributed in any secure manner, and lacks any supervision or oversight whatsoever.

83. Plaintiffs are each accused of assaulting correctional staff members, whom now have direct or indirect (through friend or family member co-worker) access to each Plaintiffs mail without any real threat or risk of being held accountable or even identified for the confiscation, disposal, or interference with Plaintiffs incoming mail.

84. Plaintiffs are informed and believe that certain John Doe Defendants have and continue to unlawfully confiscate, dispose of, or otherwise interfere with their incoming mail in retaliation for alleged staff assaults. Which Defendants Liberty, Magnusson, and Richardon encouraged, directed, ratified, and knowingly acquiesced in the actions of, and did so both individually and in pursuance of a common plan or design, to single out Plaintiffs for harsh and arbitrary treatment with regard to their correspondence and publications.

85. The above described actions by Defendants, and each of them, deprived Plaintiffs of their civil rights, including their rights to free speech and due process, in violation of the First and Fourteenth Amendments to the US Constitution.

WHEREFORE, for all the above and foregoing counts, plaintiffs pray:

A. That this Court declare that further continuation of Plaintiffs' continuous segregation and solitary confinement is violative of Plaintiffs Eighth and Fourteenth Amendments rights and the ADA and RA;

B. That this Court declare that the totality of conditions described herein also violate the Eighth Amendment;

C. That this Court issue a Preliminary and Permanent Injunction, enjoining Defendants, their agents, employees, and successors:

  1. From continuing to subject Plaintiffs, and other mentally ill prisoners, to abject confinement in segregation.

  2. From continuing to deprive Plaintiffs of such necessities as adequate mental health care and treatment, adequate and secure mail facilities and practices, adequate and safe meals, proper sanitation of physical facilities, clean and adequate bedding and clothing, reasonable telephone access, ability to earn personal property, sufficient soap and other essential hygiene items, access to shower and shaves at least 3 times per week, and adequate heating.

  3. From continuing to deny Plaintiffs such out-of-cell activities as group programs, school, worship, prosocial activities, and other rehabilitative services.

D. That Plaintiffs be awarded compensatory and punitive damages in an amount determined at trial.

E. That Plaintiffs be awarded costs and such other further relief deemed just and proper.

| | |
|---|---|
| _Zachary Swain_  11/23/20 | _Robert Carroll_  11-12-20 |
| Zachary Swain   Date: | Robert Carroll   Date: |
| MDOC #117149 | MDOC # |
| MSP | MSP |
| 807 Cushing Rd. | 807 Cushing Rd. |
| Warren, ME 04864 | Warren, ME 04864 |
| | |
| _Ryan Lane_  11-19-2020 | _Nicholas A. Gladu_  11/22/2020 |
| Ryan Lane   Date: | Nicholas A. Gladu   Date: |
| MDOC # | MDOC #21853 |
| MSP | MSP |
| 807 Cushing Rd. | 807 Cushing Rd. |
| Warren, ME 04864 | Warren, ME 04864 |

Anthony T. Hardy                11·23·20
Anthony Hardy                   Date:
MDOC #
MSP
807 Cushing Rd.
Warren, ME 04864

Jacob Zernicke                  11-17-2020
Jacob Zernicke                  Date:
MDOC #
MSP
807 Cushing Rd.
Warren, ME 04864


# VERIFICATION

I have read the foregoing Class Action Complaint against Maine Department of Corrections, et al., and know its contents to be true and correct, which I hereby swear under penalty of perjury.

Zachary Swain                   11/23/20
                                Date:

Robert Carroll                  11-17-20
Robert Carroll                  Date:

Ryan Lane                       11-19-2020
Ryan Lane                       Date:

Nicholas Gladu                  11/22/2020
                                Date:

Jacob Zernicke                  11-17-2020
Jacob Zernicke                  Date:

Anthony T. Hardy                11·23·20
Anthony Hardy                   Date: